UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JUSTIN HUGHES                    :
    *Plaintiff*                :
                               :
v.                               :          C.A. No.
                               :
LIFE INSURANCE COMPANY           :
OF NORTH AMERICA d/b/a           :
CIGNA GROUP INSURANCE            :
    *Defendant*                :

## COMPLAINT

Now comes the Plaintiff in the above entitled matter and complains as follows:

### Nature of Action

1.  This is an action seeking an award to Plaintiff of long-term disability ("LTD") benefits under the group long-term disability plan (the "Plan") established by FMR LLC, which is administered and insured by Life Insurance Company of North America d/b/a Cigna Group Insurance ("Cigna").

2.  Plaintiff seeks recovery of benefits pursuant to §502(a)(1)(B) of ERISA (29 U.S.C. §1132(a)(1)(B)).

3.  At all relevant times, the Plan constituted an "employee welfare benefit plan" as defined by 29 U.S.C. §1002(1), and as a result of his employment, Plaintiff was qualified under the Plan as a "participant" as defined by 29 U.S.C. §1002(7).  This claim relates to benefits under the foregoing Plan.

### Parties

4.  Plaintiff, Justin Hughes, is and was at all relevant times a resident of the State of Rhode Island.

5.   Defendant, Life Insurance Company of North America d/b/a Cigna Group Insurance, upon information and belief, was at all relevant times an insurance company registered to do business in Rhode Island and having a usual place of business located at Two Liberty Place, 1601 Chestnut Street, Philadelphia, PA 19192.

### Jurisdiction and Venue

6.   At all relevant times, Defendant had sufficient minimum contacts within the State of Rhode Island to satisfy the requirements for personal jurisdiction pursuant to Rhode Island's Long Arm Statute.

7.   Jurisdiction of the Court is based upon the Employee Retirement Income Security Act of 1974 (ERISA), and in particular 29 U.S.C. §1132(e)(1) and §1132(f).  In addition, this action may be brought before this Court pursuant to 28 U.S.C. §1331, which gives the District Court jurisdiction over actions that arise under the laws of the United States.

8.   ERISA provides, at 29 U.S.C. §1133, a mechanism for administrative or internal appeal of benefit denials.  The administrative appeal process is satisfied and this dispute is ripe for suit.

9.   Venue is proper in this Court because Plaintiff is a resident of the State of Rhode Island, and Defendant is subject to this Court's personal jurisdiction with respect to this action. 28 U.S.C. §1391(c)(2).

### Statements of Fact

10.   Prior to his disability, Mr. Hughes worked for ten years as a client manager for Fidelity Investments.

11.   Under the Plan, Mr. Hughes is entitled to LTD benefits if he meets the following definition of Disability:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1. Unable to perform the material duties of his or her Regular Job; and
2. Unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Job.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1. Unable to perform the material duties of his or her Regular Occupation; and
2. Unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 48 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1. Unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2. Unable to earn 60% or more of his or her Indexed Earnings.

12. Mr. Hughes became totally disabled under the terms of the Plan on or about July 26, 2011.

13. Mr. Hughes suffers from inflammatory arthritis, reflex sympathetic dystrophy syndrome ("RSDS"), and gout.

14. On or about August 20, 2011, Mr. Hughes filed a claim for disability benefits with Cigna.

15. On or about January 9, 2012, Mr. Hughes applied for Social Security Disability Insurance ("SSDI") benefits.

16. Cigna initially denied Mr. Hughes' claim for LTD benefits, finding:

There is no indication of the severity of psychiatric symptoms or evidence of severe impairment related to your psychiatric presentation. Also, there is not sufficient evidence supporting physical functional deficits. It is noted that you use a walker, cane or wheelchair for ambulation, however, your job is sedentary. Your physician provided no detail regarding the extent of your impairment in terms of functional loss such as muscle strength testing or range of motion limitations. Based on the review of the information provided, your inability to perform your job is not supported.

**Cigna, the Social Security Administration, and Minnesota Life Insurance Company**
**determined that Mr. Hughes was disabled and approved disability benefits**

17.   On or about May 10, 2012, Mr. Hughes appealed Cigna's denial of his LTD claim.

18.   On or about June 9, 2012, the Social Security Administration ("SSA") determined that

Mr. Hughes was totally disabled as of July 26, 2011 and approved his claim for SSDI

benefits.

19.   The SSA's 2003 Notice on Evaluating Cases Involving Reflex Sympathetic Dystrophy

Syndrome/Chronic Regional Pain Syndrome (the "Notice," attached hereto as **Ex. 1**)

provides that "RSDS/CRPS constitutes a medically determinable impairment when it is

documented by appropriate medical signs, symptoms and laboratory findings . . .

Disability may not be established on the basis of an individual's statement of symptoms

alone.  For purposes of Social Security disability evaluation, RSDS/CRPS can be

established in the presence of persistent complaints of pain . . . and one or more of the

following clinically documented signs in the affected region at any time following the

documented precipitant": swelling; autonomic instability; abnormal hair or nail growth;

osteoporosis; or involuntary movements of the affected region.

20.   The Notice further notes that "*[t]ransient findings are characteristic of RSDS/CRPS,*

*and do not affect a finding that a medically determinable impairment is present*."

(emphasis added)

21.   The Notice also recommends that "[w]hen evaluating duration and severity . . . the effects

of chronic pain and the use of pain medications must be carefully considered" because

"[c]hronic pain and many of the medications prescribed to treat it may affect an

individual's ability to maintain attention and concentration, as well as adversely affect his

or her cognition, mood, and behavior, and may even reduce motor reaction times."

22.     Disability under the SSDI rules is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §404.1505.

23.     The SSDI definition of disability is more difficult to satisfy than the Plan's "Regular Job," "Regular Occupation," and "Any Occupation" definitions of disability.

24.     On or about June 12, 2012, Mr. Hughes' LTD file was reviewed by Cigna's rheumatologist, Yvonne Sherrer, M.D.

25.     Dr. Sherrer concluded:

> [Mr. Hughes'] records support the diagnosis of an oligo-articular arthritis progressively worse and refractory with evolution into an RSD type picture.
>
> Based on that documentation, it supports the claimant having restrictions of no prolonged walking and no prolonged standing. He will need his legs elevated for these records document persisted swelling in the right lower extremity as he will need the ability to move about and adjust his position at will.

26.     On or about June 20, 2012, Cigna requested an addendum from Dr. Sherrer to address whether "the claimant [would] be capable of elevating his legs to a sufficient degree while performing a sedentary occupation."

27.     On or about June 27, 2012, the Minnesota Life Insurance Company approved Mr. Hughes' claim for life insurance waiver of premium benefits due to his disability.

28.     Minnesota Life Insurance Company's policy's waiver of premium provision defines total disability as "a disability which occurs while the insured's insurance is in force and which results from an accidental injury or a disease that continuously prevents the insured from engaging in an occupation . . . During the first 24 months of total disability,

'occupation' means the insured's regular occupation.  After 24 months, it means any

occupation for which the insured is reasonably fitted by education, training or

experience."

29.     Upon information and belief, Minnesota Life Insurance Company's policy's definition of

disability is more difficult to meet than the Plan's "Regular Job," "Regular Occupation,"

and "Any Occupation" definitions of disability.

30.     On or about June 28, 2012, Dr. Sherrer responded to Cigna's addendum request, stating:

> The appropriate treatment of leg edema is elevating the leg(s) above
> the level of the heart.  This cannot be accomplished in most
> sedentary work environments.  Elevating the extremity while sitting
> would not be expected to be as beneficial as lying down throughout
> the day with the leg elevated above the level of the heart.  Even when
> sitting the leg would need to be elevated at least above the level of
> the hip which would also not be appropriate in most sedentary work
> environments.

31.     On or about June 29, 2012, Cigna reversed its decision and approved Mr. Hughes' claim

for LTD benefits, based on Dr. Sherrer's opinion.

**For the next several years, Cigna determined that Mr. Hughes was continuously disabled under the Regular Job, Regular Occupation, and Any Occupation definitions of disability**

32.     On or about August 23, 2012, Cigna commenced a review of Mr. Hughes' claim.

33.     On October 9, 2012 through October 11, 2012, Cigna conducted video surveillance on

Mr. Hughes and obtained approximately 41 minutes of activity over three days.

34.     On or about July 16, 2013, Cigna determined that Mr. Hughes was disabled and wrote to

him, informing him that it was continuing his LTD benefits beyond January 23, 2014 (the

date the definition of disability changed to "Regular Occupation").

35.     Cigna reviewed Mr. Hughes' claim again in 2014.

36. On or about July 8, 2014, Cigna determined that Mr. Hughes was disabled and wrote to him, informing him that it was continuing his LTD benefits beyond January 23, 2016 (the date the definition of disability changed to "Any Occupation").

37. On or about July 8, 2014, Cigna employee Maggie Goodson, wrote the following in a claim note: "Per NCM [nurse case manager] CM [claim manager] to f/u in 9-12 months for updated status as *unlikely condition will improve much*." (emphasis added).

38. On or about July 8, 2014, Cigna employee Jacqueline Miles, wrote the following in a strategy documentation claim note:

> Last staffing, restrictions were supported stating no prolonged sitting or walking, must be able to move about and adjust position at will, and/or elevation of legs above hip level x 10-15 min every 2 hours. Previous Cm [spoke with] NCM and it is noted that Cx's condition is not likely to improve. Cm [spoke with] VOC and occs would not be found that meet restrictions, particularly leg elevation restriction. SSDI has been awarded. Cm recommends [any occupation] approval and referral to SAMs [stable and mature] for ongoing mgmt.

39. On or about May 10, 2016, Cigna wrote to Mr. Hughes, informing him that it was conducting a recertification of his claim.

## Cigna terminated Mr. Hughes' LTD benefits

40. On or about September 15, 2016, Cigna requested "an exploratory [transferable skills analysis] in order to provide vocational direction to the Recert CM about the impact an FCE would have on determining the customer's ability to do other occupations."

41. On or about September 15, 2016, Cigna rehabilitation specialist Perry Glaze wrote:

> Full sedentary occupations were researched as requested by the Recert CM. Based on customer's work history, education and skills, some sedentary occupations were found to be appropriate that would satisfy the WR of $21.76/hour. These occupations are in the financial institutions industry and include the customer's own occupation as a Registered Representative

(250.257-018, Sedentary).  Again, this is based on sedentary with no
additional R/L's.  Claim is being returned to Recert CM for further claim
management.

42. Upon information and belief, Mr. Glaze's transferable skills analysis was performed
without consideration of the medical evidence or Cigna's prior determinations that Mr.
Hughes' was disabled from sedentary work and that his condition was unlikely to
improve.  Mr. Glaze's opinion was based on the assumption that Mr. Hughes had full
sedentary occupational capabilities.

43. On or about November 3, 2016, Cigna referred Mr. Hughes for an occupational medicine
independent medical exam ("IME"), through its vendor, Dane Street LLC.

44. On or about December 1, 2016, Mr. Hughes attended an IME with Robert Swotinsky,
M.D., an occupational medicine specialist.

45. After one 40-minute exam, and against the clear weight of the evidence, Dr. Swotinsky
concluded: "Occasional, temporary absences from work may occur due to gout attacks.
Activity limitations and restrictions are not otherwise identified that would preclude
standing, walking, use of one's arms and hands, or other office-based activities and
occasional car travel."

46. On or about December 1, 2016 through December 3, 2016, Cigna conducted video
surveillance on Mr. Hughes for a second time and obtained approximately 42 minutes of
activity over three days.

47. The type and level of activity shown in the December 2016 surveillance was consistent
with that shown in the October 2012 surveillance, during which Cigna had approved
benefits.

48.     The December 2016 surveillance showed a type and level of activity that is consistent

        with Mr. Hughes' claimed impairments.

49.     On or about December 7, 2016, Cigna employee Cathy A. Herzog conducted another

        Transferable Skills Analysis, based entirely on Dr. Swotinsky's report.

50.     Against the clear weight of the evidence, Ms. Herzog concluded that Mr. Hughes could

        work as a repair order clerk or registered representative.

51.     On or about December 15, 2016, against the clear weight of the evidence, Cigna

        terminated Mr. Hughes' LTD benefits.  In its denial letter, Cigna wrote: "[T]here is no

        medical documentation showing how your condition would continue to prevent you from

        performing the material duties of any occupation, and the medical information on file is

        no longer supportive of disability as defined in the policy."

52.     Since the time that Cigna determined that he was disabled, Mr. Hughes' condition had

        not materially improved and he remained continuously disabled under the terms of the

        Plan.

**Mr. Hughes appealed Cigna's wrongful termination of his LTD benefits**

53.     On January 4, 2017, Mr. Hughes had an appointment with his treating rheumatologist,

        Edward Lally, M.D.  Dr. Lally is the director of the Division of Rheumatology at Rhode

        Island Hospital.

54.     Dr. Lally observed:

> This is a f/u visit for a gentleman w/ chronic seronegative
> inflammatory polyarthritis who was last here on 10/12/16.  He has
> been unable to wean off steroids and frequently requires increased
> doses of medrol for flares . . . He still has flares including one which
> he called me for last week, on 12/23/16, in both ankles and feet.  At
> that time, I suggested that he increase his medrol dose from 8 mg
> BID to 16 mg BID.  This gentleman's case has been even more

complicated by a chronic MSK pain syndrome since he had RSDS
and he also has gout.

55.     Upon exam, Dr. Lally noted medial swelling, erythema, and tenderness in Mr. Hughes'

left ankle, as well as decreased flexion and extension with significant pain.

56.     Mr. Hughes' medications included 16 milligrams of Medrol twice per day, 900

milligrams of gabapentin three times per day, 50 milligrams of tramadol every four to six

hours as needed, 300 milligrams of allopurinol once per day, and a 50 milligrams per

milliliter Enbrel injection once per week.

57.     On March 29, 2017, Mr. Hughes had another appointment with Dr. Lally.  Dr. Lally's

exam demonstrated "R elbow sl swollen w/ joint effusion, synovial thickening; lacks

about 10 degrees of full extension," "L ankle: sl medial swelling, no warmth, erythema;

mild tenderness," and "L midfoot tenderness."

58.     Dr. Lally concluded: "This gentleman's case remains quite problematic.  I would

conclude that he has failed Enbrel.  He was previously on Humira at MGH.  Even though

he is seronegative, I think the choices would be Xeljanz, Actemra and Rituxan.  I was

hoping to not have to go this route.  But he has had recurrent inflammatory arthritis,

including his R elbow while on Enbrel and high-dose steroids."

59.     On or about May 16, 2017, Minnesota Life Insurance Company wrote to Mr. Hughes

stating: "The claim form(s) you submitted have been reviewed and your disability claim

has been allowed/continued.  Your life insurance, covered under the waiver of premium

provision, will continue to remain in force without payment of premium for the next two

years, or until recovery if prior to that time."

60.     Upon information and belief, Minnesota Life Insurance Company based its decision upon

review of claim forms completed by both Mr. Hughes and Dr. Lally.

61.     On May 16, 2017, Dr. Lally wrote a report explaining Mr. Hughes' medical and disability

status.  He stated:

> [Mr. Hughes'] tests for rheumatoid arthritis were (-) but he clearly
> had inflammatory oligoarthritis mainly, but not exclusively, of his
> lower extremity joints.  He had episodes of severe inflammation
> involving his knees, feet and ankles that required prednisone Rx.
> Ultimately he was unable to be weaned off of steroids and is still on
> them.    My diagnosis was of a seronegative inflammatory
> polyarthritis and I felt he would eventually be shown to have a
> spondyloarthropathy.  But there is no question that he had severe
> episodes of inflammation in which he often presented on crutches
> and w/ severe joint pain, swelling and limited ROM.  Ultimately, he
> was found to have gout in l knee.  But even effective Rx for gout did
> not result in control of his frequent episodes of inflammatory
> arthritis.
>
> To complicate matters he has also been diagnosed w/ reflex
> sympathetic dystrophy (RSDS) on the basis of clinical findings and
> radiographic studies.  This [has] also aggravated his musculoskeletal
> pain and required medications to control the symptoms.
>
> So, his case has been dominated by 3 rheumatic conditions:
> inflammatory polyarthritis, RSDS and gout.  He still has very active
> symptoms and has been unable to wean off of steroids.  He has been
> on a number of medications and most recently started on Xeljanz.
>
> ***There is no question in my mind that this patient has major
> impairments from his rheumatic conditions and should be
> considered totally disabled.*** (emphasis added).

62.     On June 3, 2017, Mr. Hughes underwent a functional capacity evaluation ("FCE") with

Robin Dolan, PT and Christine Frati, B.S.

63.     Ms. Dolan observed: "Mr. Hughes exhibited extremely poor posture and body mechanics

throughout [the] assessment which further declined with weighted activities.  In addition,

during the assessment break time, Mr. Hughes fell asleep.  In addition, he required to lie

down between the last four (4) functional tasks in order to complete the assessment. Pace

and fatigue was certainly impacted by medication usage."

11

64.    The FCE results demonstrated that Mr. Hughes' "overall workday tolerance is 1-2 hours, sitting 2-3 hours 30 minute duration, standing 1-2 hours for 20 minute duration, walking 1-2 hours minimal occasional short distances."

65.    Ms. Dolan reported the following:

> In Summary, the finding's identified in this Functional Assessment do not concur with Dr. Swotinsky['s] statements of no identifiable activity limitation . . . In addition, the ongoing use of narcotics, analgesics and steroid use coupled with periodic emergency room visits for IV medications would negatively impact attendance in the work force . . . I find Mr. Hughes to be **Totally disabled** based upon the functional data obtained during this assessment and review of his medical records.   The Functional Capacity Assessment identified, this individual does not meet the physical requirements for any occupation with full time pace and persistency.

66.    By letter dated June 13, 2017, Mr. Hughes timely appealed Cigna's LTD claim denial.

67.    On or about July 11, 2017, Cigna referred Mr. Hughes' file for an occupational medicine peer review, a rheumatology peer review, and a neuropsychology peer review through its vendor, MES Solutions.

68.    On or about July 13, 2017, Dr. Lally wrote the following in an exam note: "This gentleman's case remains quite problematic.  He has been on Xeljanz for > 2 months and has felt no better; in fact, worse.  He has active synovitis of his ankles and feet but his R elbow is not swollen.  He requests to go back on Enbrel and I agree."

69.    On or about August 2, 2017, Cigna's rheumatology consultant, N. Nichole Barry, M.D., spoke with Dr. Lally.

70.    Dr. Barry reported that Dr. Lally stated "that he has been seeing the claimant for years and believes that he has a spondylarthropathy [(long-term chronic disease of joints)] and is 'completely disabled' and unable to work."

71.  Dr. Barry stated that she "asked if [Mr. Hughes] had episodic flares of his synovitis and [Dr. Lally] stated [Mr. Hughes] had episodes of worse symptoms, but then does have ankle synovitis daily which limits him . . . He mentioned that the claimant requires daily steroids and he has been unable to wean the steroids off."

72.  Dr. Barry concluded that the "conversation did not affect [her] original determination."

73.  On or about August 8, 2017, Mr. Hughes' file was reviewed by Dr. Barry.

74.  Dr. Barry wrote the following in her August 8, 2017 report:

> Based on [the] records provided and the surveillance video, the claimant is not functionally limited on a continuing basis.  The claimant has an episodic inflammatory arthritis, which has been diagnosed as gout.  Although the provider reports that the claimant also has an additional arthritis condition to gout, the presence of a different process other than a crystal arthropathy to explain his episodic joint and tendon swelling has never been documented.
> . . .
> [T]he claimant would have functional limitation only during a documented flare, which would last no more than 5 day[s] . . .
>
> During a flare the claimant would be able to perform a sedentary level job, with standing, walking and climbing stairs up to 2 hours in an 8 hour day.  The claimant has no restrictions to lift, carry, push, pull, stoop, kneel, crouch, crawl, sit, reach in any direction, use lower extremities for foot controls, and perform fine manipulation and simple and firm grasping.

75.  Dr. Barry's opinion was against the clear weight of the evidence.

76.  Upon information and belief, Dr. Barry cherry-picked evidence and arbitrarily minimized and/or ignored evidence that supported Mr. Hughes' claim.

77.  Upon information and belief, Dr. Barry speculated, without any supporting evidence, that Mr. Hughes stopped some of his medication in order to appear more disabled for the IME, by stating: "It is interesting that the claimant appears to have discontinued his allopurinol (as evidenced by the markedly elevated serum uric acid level) in October,

prior to his IME evaluation, after doing fairly well during the majority of 2016 . . . The sudden lack of compliance is not well explained other than he did have an IME in December 2016."

78.  Contrary to Dr. Barry's speculation, Mr. Hughes' elevated serum uric acid level does not definitively establish that Mr. Hughes discontinued his medication.

79.  Contrary to Dr. Barry's speculation, Mr. Hughes did not learn of (and Cigna did not even request) the IME until November 2016.  Thus, Mr. Hughes could not have discontinued his medication in October 2016 in anticipation of an IME that he was not aware of.

80.  On or about August 8, 2017, Mr. Hughes' file was reviewed by Cigna's occupational medicine consultant, Siva Ayyar, M.D.

81.  Against the clear weight of the evidence, Dr. Ayyar concluded that Mr. Hughes did not have any physical restrictions or limitations.

82.  Upon information and belief, Dr. Ayyar cherry-picked evidence and arbitrarily minimized and/or ignored evidence that supported Mr. Hughes' claim.

83.  On or about August 8, 2017, Mr. Hughes' file was reviewed by Cigna's neuropsychological consultant, Edan Critchfield, Psy.D.  Dr. Critchfield concluded that "[t]here is no evidence to support mental, cognitive or behavioral impairment or work activity restrictions from 1/14/2017 to the present."

84.  On or about August 30, 2017, Cigna appeal specialist Jared Lindner requested a transferable skills analysis "based on the supported R/L's from the Rheumatology [peer review] dated 8/8/2017 from Dr. Nichole Barry."

85. On or about September 6, 2017, Cigna employee Randy Norris conducted a transferable skills analysis and determined that Mr. Hughes could work as a financial aid counselor or registered representative.

86. Upon information and belief, Mr. Norris' opinion was against the clear weight of the evidence.

87. Upon information and belief, Mr. Norris' opinion was based only on the materially flawed opinion of Dr. Barry.

**Against the clear weight of the evidence, Cigna denied Mr. Hughes' first appeal**

88. On or about September 15, 2017, Cigna wrote to Mr. Hughes, informing him that it was upholding its termination of his LTD benefits.

89. Cigna's letter quoted directly from the reports of Dr. Barry and Dr. Ayyar, and concluded: "We are not disputing that your client may have restrictions and/or limitations, but an explanation of his functionality and how his functional capacity prevents him from performing any occupation from January 14, 2017 and forward is not medically supported."

90. Cigna's decision to terminate Mr. Hughes' LTD benefits and deny his appeal was against the clear weight of the evidence.

91. Cigna's decision to terminate Mr. Hughes' LTD benefits and deny his appeal was wrong, arbitrary, and capricious.

**Mr. Hughes filed a second level appeal**

92. On or about November 1, 2017, Mr. Hughes followed-up with Dr. Lally.

93. Dr. Lally observed: "This is a f/u visit for a gentleman w/ seronegative inflammatory arthritis, likely a SpA, who was last here on 7/13/17.  He has been steroid-dependent for

15

the past few years and, prior to the last visit, was switched from Enbrel to Xeljanz for presumed lack of efficacy of Enbrel.  But he then felt much worse on Xeljanz so, on the last visit, he went back on Enbrel plus his varying doses of medrol."

94.   Mr. Hughes' blood tests from his prior appointment with Dr. Lally revealed an elevated white blood cell level, elevated c-reactive protein level of 16.28, and elevated erythrocyte sedimentation rate of 79, which all indicate inflammation in the body.

95.   Dr. Lally noted: "He also has crystal-proven gout but this Dx does not explain his chronic inflammatory arthropathy.  He has been maintained on ULT w/ allopurinol . . . He has not had any attacks of gout."

96.   Dr. Lally further observed: "He also has more widespread MSK pain, partly due to RSDS/CRPS.  He is maintaine[d] [on] opioid analgesics for this. He continues on 900 mg gabapentin [three times per day] and ***mostly tolerates it***." (emphasis added).

97.   On or about March 5, 2018, Mr. Hughes followed-up with Dr. Lally, who observed: "Despite the addition of Enbrel to his regiment, he has been unable to wean off of steroids despite numerous attempts.  He also has crystal-proven gout but my formulation has been that his episodic LE arthritis is mostly due to an undifferentiated SpA.  He also has CRPS/RSDS compounding his ***chronic MSK pain***." (emphasis added).

98.   Regarding Mr. Hughes' inflammatory polyarthritis, Dr. Lally assessed: "Since the last visit, this pt has had one significant flare in his ankles in January which was prolonged and for which he took 32 mg medrol for about a month.  He is back to his baseline but has more difficulty w/ his gait and is now using a cane regularly.  He has not been able to wean off of steroids even w/ Enbrel on board which was the plan."

99.  On or about March 9, 2018, Robin Dolan reviewed the December 2016 surveillance relied on by Cigna's file review doctors.

100.  Ms. Dolan opined that the surveillance did not change the opinion expressed in her June 3, 2017 functional capacity report, in part because Mr. Hughes' "diagnosis of RSD has symptom variations" and "the video surveillance does not depict any functional task of significance being performed."

101.  Ms. Dolan noted that Mr. Hughes "is seen walking short distances without [assistive device] as demonstrated on day of assessment [with] gait deviations of decreased stride length, stance and altered [] arm swing on left.  He is seen carry[ing] small bag looking to weigh[] less than 5#."

102.  Ms. Dolan concluded that there was "no evidence depicted on a 3 day surveillance to question findings."

103.  Upon information and belief, Ms. Dolan was the only medical professional to both view the surveillance and examine Mr. Hughes.

104.  By letter dated March 12, 2018, Mr. Hughes timely appealed Cigna's LTD claim termination and initial appeal denial.

105.  On or about April 3, 2018, Cigna referred Mr. Hughes' file for an occupational medicine peer review, through its vendor, Medical Consultants Network.

106.  On or about April 9, 2018, Uchechukwu Elendu, M.D., the occupational medicine specialist hired by Cigna, spoke with Dr. Lally.

107.  Dr. Lally reported to Dr. Elendu that Mr. Hughes "has history of chronic inflammatory arthritis, Gout, and CRPS that were limiting him physically" and "[h]is symptoms have not been controlled with steroid therapy.

108.  Dr. Lally noted that "[Mr. Hughes] has limitation in ankle/knee range of motion.  He has

swollen joints in the knees and ankles."

109.  Dr. Lally opined to Dr. Elendu that "[Mr. Hughes] is disabled.  He has chronic pain,

swollen joints, and is presently on Enbrel.  He has been tried on several Biologics without

much improvement."

110.  "Regarding ability to work with restrictions, Dr. Edward Lally stated, 'I don't think he

can work.  It will make his symptoms worse.'"

111.  On or about April 16, 2018, Dr. Elendu reviewed Mr. Hughes' file.

112.  Dr. Elendu spent five pages outlining each of Mr. Hughes' medical records dating back to

2007, but failed to mention Mr. Hughes' July 13, 2017, November 1, 2017, and March 5,

2018 appointments with Dr. Lally, or Ms. Dolan's March 9, 2018 report, which were

submitted with Mr. Hughes' second appeal.  Upon information and belief, Cigna failed to

provide Dr. Elendu with these records.

113.  After his review of the incomplete record, Dr. Elendu concluded that Mr. Hughes "will

be functionally limited due to CRPS, and during acute flare-up of inflammatory arthritis,

and Gout" based on his observation that "[Mr. Hughes'] is noted to have swollen joints,

especially in the left ankle (as evidenced by picture in the record).  He also has limitation

in ankle/knee range of motion and left mid foot tenderness . . . On examination of the

bilateral feet, it was noted to be pale as compared to the lower extremities.  Sensation to

light touch was reported to be reduced at the right distal/lateral foot in comparison to the

left."

114.  Dr. Elendu then determined that Mr. Hughes

will have no sitting restriction in an 8 hour[] day.  The claimant
can stand 20 minutes at a time for up to 2hrs total in an 8-hr day.

18

> The claimant can walk 20 minutes at a time for up to 2hrs total in an 8-hr day. He will be unable to climb stairs/ladders. He should be able to lift/carry/push/pull only up to 50 pounds occasionally. The claimant should be able to reach above shoulder level and reach below waist level frequently. The claimant can reach at desk level unrestricted. He has no restrictions with stooping/kneeling/crouching/crawling/use of lower extremity for foot control/fine manipulation/simple and firm grasping. He has no restriction with seeing/hearing. He is not limited in driving car or light truck.

115. Despite concluding that Mr. Hughes would be functionally limited, in part, due to CRPS, which is a chronic pain syndrome, Dr. Elendu determined only that Mr. Hughes "may experience episodic flare-up of inflammatory arthritis, and Gout which may cause pain."

116. Upon information and belief, Dr. Elendu failed to meaningfully consider Mr. Hughes' chronic pain, or the pain medications he requires on a daily basis.

117. Upon information and belief, Dr. Elendu arbitrarily minimized and/or ignored evidence that supported Mr. Hughes' claim.

**Cigna denied Mr. Hughes' second level appeal**

118. On or about May 9, 2018, Cigna wrote to Mr. Hughes, informing him that it was continuing to uphold its termination of his LTD benefits.

119. Cigna's letter concluded that it was "not disputing that your client may have restrictions and/or limitations, but an explanation of his functionality and how his functional capacity prevents him from performing any occupation from January 14, 2017 and forward is not medically supported."

120. Cigna failed to give significant weight to Mr. Hughes' SSDI award.

121. Regarding Mr. Hughes' approval for SSDI, Cigna stated, in part: "[Mr. Hughes'] SSDI award is aged and no longer consistent with the more current medical information we

received.  [Mr. Hughes] was over 50 years old at the time of the award.  The SSA used a reduced standard of proof to make their decision based on [Mr. Hughes'] age."

122.   Mr. Hughes is currently only 43-years-old.

123.   Contrary to Cigna's statement, Mr. Hughes was 37-years-old when he was awarded SSDI benefits.

124.   Cigna's decision to terminate Mr. Hughes' LTD benefits and deny his appeals was against the clear weight of the evidence.

125.   Cigna's decision to terminate Mr. Hughes' LTD benefits and deny his appeals was wrong, arbitrary, and capricious.

126.   Cigna terminated Mr. Hughes' benefits and denied his appeals without explaining what changed with respect to his health since Cigna had last determined that he was disabled, that would cause him to now be considered not disabled under the Plan and enable him to return to work.

127.   Upon information and belief, Cigna was responsible for paying Plaintiff's LTD benefits.

128.   Upon information and belief, Cigna had a financial conflict of interest serving as (a) the fiduciary to determine plan beneficiaries' entitlement to benefits, and (b) the entity responsible for paying such benefits from its own assets.

129.   Upon information and belief, Cigna had a financial incentive to terminate Plaintiff's Plan benefits.

130.   Upon information and belief, Cigna's wrongful conduct during the administration of Plaintiff's claim was the result of Cigna's conflict of interest.

131.   Upon information and belief, Cigna's decision to deny Plaintiff's benefits was the result of Cigna's conflict of interest.

132.   Upon information and belief, the opinion of Dr. Robert Swotinsky was influenced by Cigna's conflict of interest, as well as his own financial conflict of interest and his desire for repeat business from Cigna and/or Dane Street, LLC.

133.   Upon information and belief, the opinion of Dr. Nichole Barry was influenced by Cigna's conflict of interest, as well as her own financial conflict of interest and her desire for repeat business from Cigna and/or MES Solutions.

134.   Upon information and belief, the opinion of Dr. Siva Ayyar was influenced by Cigna's conflict of interest, as well as his own financial conflict of interest and his desire for repeat business from Cigna and/or MES Solutions.

135.   Upon information and belief, the opinion of Dr. Edan Critchfield was influenced by Cigna's conflict of interest, as well as her own financial conflict of interest and her desire for repeat business from Cigna and/or MES Solutions.

136.   Upon information and belief, the opinion of Dr. Uchechukwu Elendu was influenced by Cigna's conflict of interest, as well as his own financial conflict of interest and his desire for repeat business from Cigna and/or Medical Consultants Network.

137.   Under the terms of the Plan, Cigna has no discretion, therefore, the Court's review of Plaintiff's claim is *de novo*.

138.   Pursuant to R.I.G.L. § 27-4-28, Cigna has no discretion under the Plan, therefore, the Court's review of Plaintiff's claim is *de novo*.

139.   Based on the evidence submitted to Cigna or otherwise available to Cigna, establishing that Plaintiff has met the Plan conditions for entitlement to benefits continuously since July 26, 2011, and that he at all relevant times continued to meet said conditions, Plaintiff

is entitled to payment of all Plan LTD benefits owed to him plus interest on all

improperly withheld payments.

## COUNT I
**(Enforcement of Plaintiff's Rights Under the Plan
– ERISA 29 U.S.C. §1132(a)(1)(B))**

140.   Plaintiff repeats and reaffirms the above paragraphs, as though fully set forth herein.

141.   Plaintiff is entitled to enforcement of all of his rights under the Plan, including but not

limited to, payment of all past and present monthly disability insurance benefits.

142.   Plaintiff is entitled to interest on all overdue payments.

## COUNT II
**(Breach of Fiduciary Duty Under the Plan
– ERISA 29 U.S.C. §1104)**

143.   Plaintiff repeats and reaffirms the above paragraphs, as though fully set forth herein.

144.   To the detriment of Plaintiff, Cigna failed to discharge its duties with respect to the Plan

solely in the interest of the participants and beneficiaries and for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable

expenses of administering the plan.

145.   To the detriment of Plaintiff, Cigna failed to discharge its duties with respect to the Plan

solely in the interest of participants and beneficiaries and with the care, skill, prudence,

and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims.

## COUNT III
**(Clarification of Plaintiff's Rights to Future Benefits Under the Terms of the Plan
– ERISA 29 U.S.C. §1132(a)(1)(B))**

146.   Plaintiff repeats and reaffirms the above paragraphs, as though fully set forth herein.

147.   Pursuant to 29 U.S.C. §1132(a)(1)(B), Plaintiff is entitled to clarification of his rights to future benefits under the terms of the Plan.

148.   Plaintiff seeks a declaration that he has been continuously disabled under the terms of the Plan from July 26, 2011 to the present, and that he is entitled to any and all benefits wrongfully withheld for said period.

149.   Plaintiff further seeks a declaration that he is entitled to interest on all benefits determined to have been wrongly withheld from him under the Plan.

## <u>COUNT IV</u>
### (Declaration of Plaintiff's Rights Under the Plan – 28 U.S.C. §2201)

150.   Plaintiff repeats and reaffirms the above paragraphs, as though fully set forth herein.

151.   Based on the above asserted facts and allegations, this matter constitutes a case in controversy under the Declaratory Judgment Act, 28 U.S.C. §2201 and Plaintiff is entitled to a declaratory judgment establishing his rights under the Plan.

152.   Plaintiff seeks a declaration that he has been continuously disabled under the terms of the Plan from July 26, 2011 through the present, and that he is entitled to any and all benefits wrongfully withheld under the Plan for said period.

153.   Plaintiff further seeks a declaration that he is entitled to interest on all benefits determined to have been wrongfully withheld from him under the Plan.


WHEREFORE, Plaintiff prays for the following relief:

A.   That the Court enter judgment in Plaintiff's favor and against Cigna and that the Court order Cigna to pay LTD income benefits to Plaintiff in the amount equal to the contractual amount of benefits to which Plaintiff is entitled.

B.      That the Court order Cigna to pay Plaintiff prejudgment interest on all benefits that have

accrued prior to the date of judgment.

C.      That the Court order Cigna to continue paying Plaintiff benefits until such time as

Plaintiff meets the policy conditions for discontinuance of benefits.

D.      That the Court award Plaintiff attorney's fees pursuant to 29 U.S.C. §1132(g).

E.      That the Court enter declaratory judgment clarifying and establishing Plaintiff's rights

under the Plan.

F.      For such other legal or equitable relief as this Court deems just and proper, as well as the

costs of suit.


The Plaintiff hereby designates J. Scott. Kilpatrick as Trial Counsel in this matter.

                                          Plaintiff, by his attorneys,


                                          */s/* J. Scott Kilpatrick
                                          J. Scott Kilpatrick, Esq. (#4036)
                                          jskilpatrick@cck-law.com
                                          Mason J. Waring, Esq. (#7737)
                                          mwaring@cck-law.com
                                          Leah Small, Esq. (#9701)
                                          lsmall@cck-law.com
                                          Chisholm Chisholm & Kilpatrick LTD
                                          One Turks Head Place - Suite 1100
                                          Providence, RI 02903
                                          (401) 331-6300 Telephone
                                          (401) 421-3185 Facsimile